UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



----------------------------------------X

THE ESTEE LAUDER COMPANIES INC.,

        Plaintiff,

                                       06 Civ. 2035 (RWS)

  - against -

                                       O P I N I O N

SHASHI BATRA,

        Defendant.

----------------------------------------X

A P P E A R A N C E S:

    PATTERSON, BELKNAP, WEBB & TYLER
    Attorneys for Plaintiff
    1133 Avenue of the Americas
    New York, NY 10036-6710
    By:  GREGORY L. DISKANT, ESQ.
         ELLEN M. MARTIN, ESQ.
         CHRISTOPHER M. P. JACKSON, ESQ.
         Of Counsel

    DICKSTEIN SHAPIRO MORIN & OSHINSKY
    Attorneys for Defendant
    1177 Avenue of the Americas
    New York, NY 10036
    By:  HOWARD GRAFF, ESQ.
         NEAL S. BARLIA, ESQ.
         VICTORIA A. KUMMER, ESQ.
         Of Counsel

**Sweet, D.J.,**

Plaintiff Estee Lauder Companies, Inc. ("Estee Lauder") has moved by order to show cause for a temporary restraining order and preliminary injunction pursuant to Rule 65, Fed. R. Civ. P., to restrain defendant Shashi Batra ("Batra") from breaching the terms of his Confidentiality, Non-solicitation, and Non-competition Agreement with Estee Lauder (the "Non-compete Agreement") and from engaging in employment with N.V. Perricone M.D. Ltd ("Perricone").

Batra has cross-moved seeking this Court to abstain or alternatively for a stay, citing Colorado River Water Conservation Dist. v. United States, 424 U.S. 800, 813, 96 S. Ct. 1236, 1244, 47 L. Ed. 2d 483 (1976). For the reasons set forth below, a preliminary injunction will issue and the motion to abstain is denied.

## Prior Proceedings

On March 13, 2006, Batra filed a complaint in California State Court seeking a declaratory judgment that the Non-compete Agreement was void under California Law. On March 15, 2006, Estee Lauder filed its complaint against Batra alleging: (1) breach of Batra's Non-compete agreement and (2) theft of trade secrets. On March 20, 2006, Batra cross-moved this Court by order to show cause for abstention and a stay.

1

Discovery was expedited. Hearings were conducted by way of deposition on March 22, March 23, and April 4, 2006. The motions of Estee Lauder and Batra were marked fully submitted on April 4, 2006.

## Facts

For the purposes of this motion, the Court makes the following preliminary findings of fact, pursuant to Fed. R. Civ. P. 52(a) and 65, which are based on the affidavits submitted by the parties and the depositions conducted at the hearing.

## I. **The Parties**

Plaintiff Estee Lauder is a corporation organized under the laws of the State of Delaware with its principal place of business located in New York, New York. (Compl. ¶ 6.) Estee Lauder is engaged in the business of manufacturing and marketing skin care, makeup, fragrance, and hair care products. (Bousquet-Chavanne Declaration ("B-C Decl.") ¶ 2.)

Defendant Batra is an individual who resides in San Francisco, California, (Compl. ¶ 7.), and did from 2004 until March 10, 2006, when he was employed as a senior executive for two of Estee Lauder's brands, Rodan and Fields ("R+F") and Darphin. On or

2

about March 13, 2006, Batra began employment as the Worldwide
General Manager of Perricone.

## II.  **Estee Lauder's Business**

Estee Lauder employs approximately 6,700 employees in New
York and approximately 1,800 employees in California.  (Hearing
Trans. 03/23/06 at 24).  Senior Management of Estee Lauder is
located in New York, including the chief executive officer, chief
operating officer, chief financial officer, head of operations,
manufacturing, head of information systems, senior counsel, head of
worldwide Human Resources, and group presidents.  (Id. at 25).  Of
the 14 General Brand Managers, 11 are located in New York.  (Id.).
The Darphin general manager is located in Paris, the R+F General
Brand Manager (Batra) is located in San Francisco, and the Aveda
General Brand Manager is located in Minneapolis.  (Id. at 25).

In 2003, Estee Lauder acquired R+F, a dermatologist-
founded skin care brand, and Darphin, a Paris-based pharmacy skin
care and make-up company.  (B-C Decl. at 2).  Both the R+F and
Darphin brands market and sell their products in the cosmetic
dermatology market.  (Id.)

R+F was founded by Stanford-trained dermatologists Katie
Rodan, M.D. and Kathy Fields, M.D.  (Id. at 3).  R+F develops skin
care products marketed to consumers seeking products and regimens

3

created by expert dermatologists. (Id. at 3). The R+F skin care line offers products for specific skin problems, such as severe acne conditions and sensitive skin. (Id.).

Darphin is a Paris-based brand, originally sold in European pharmacy channels, that offers prestige skin care, make-up and personal care products created from plant extracts and botanical aromas. (Id. at 3-4). Darphin products are sold in more than 55 countries and territories. (Id.) In North America, Darphin is primarily distributed through high-end retail establishments and specialty stores. (Id.)

The R+F and Darphin brands report directly to Senior Management in New York. (Hearing Trans. 03/23/06 at 26).

## III. **Batra's Employment with Estee Lauder**

Batra was hired as Global General Brand Manager of R+F as of January 5, 2004. (B-C Decl. at 4). Effective July 1, 2005, Batra also assumed the role as General Manager for Darphin, North America. (Id.) In his role for R+F, Batra was the senior executive in charge of the brand and was responsible for overseeing all aspects of R+F's business, including, research and development, marketing and distribution, pricing, packaging development, corporate finance, regulatory affairs, internet development, and public relations. (Id.) In his role for Darphin, Batra was

4

responsible for marketing and distribution, pricing and overall accounts management strategies for the Darphin brands in North America. (Id.)

Batra had worldwide responsibility for R+F. (Id.) Similarly, he is assuming worldwide responsibility for Perricone. As brand manager of R+F, Batra was responsible for product development and for guiding new product entries into different market segments. (Hearing Trans. 03/23/06 at 36). This required him to participate in new product development meetings and to keep abreast of the technologies and key ingredients for the products developers were asked to create for R+F. (Id. at 36). In this capacity, Batra was responsible for preparing and implementing brand strategies for the R+F brand for fiscal years 2007 and 2008. (Id.)

At the commencement of his employment, Batra signed an employment agreement with Estee Lauder, which contained confidentiality, non-solicitation, non-competition provisions. (See Exhibit B to B-C Decl.). In return for signing the agreement (which all Estee Lauder executive employees are required to sign) Batra received a $100,000 signing bonus. (B-C Decl. at 5). In addition, Batra was provided with a compensation package of $300,000 per year, benefits, an automobile allowance, stock options, and bonus eligibility. (Id.) On July 1, 2004, Batra's base salary was increased to $325,000. (Id.) In July, 2005, in conjunction with

5

his new responsibilities for Darphin, Estee Lauder increased Batra's base salary to $375,000. (Id.)

The non-competition clause, contained in Paragraph 4 of the employment agreement that Batra signed in January 2004, provides as follows:

You recognize that the Company's business is very competitive and that to protect its Confidential Information the Company expects you not to compete with it for a period of time. You therefore agree that during your employment with the Company, and for a period of twelve (12) months after termination of you employment with the Company, regardless of the reason for the termination, you will not work for or otherwise actively participate in any business on behalf of any Competitor in which you could benefit the Competitor's business or harm the Company's business by using or disclosing Confidential Information. This restriction shall apply only in the geographic areas for which you had work-related responsibility during the last twelve (12) months of your employment by the Company and in any other geographic area in which you could benefit the Competitor's business through the use or disclosure of Confidential Information.

(Exhibit B to B-C Decl. ¶ 4).

In addition, the agreement contained a non-solicitation provision, contained in Paragraph 5, pursuant to which Batra agreed that he would:

not, directly or indirectly, solicit, induce, recruit, or encourage any of the Company's employees to terminate their employment with the Company or to perform services for any other business.

(Id. at ¶ 5).

6

Paragraph 7 of the agreement provides that:

> During the period in which you are subject to the non-competition restrictions of paragraph 4, the Company will continue to pay you your last regular salary at the Company. If at any time during this period the Company gives you a written release from the restriction, the Company will no long be obligated to make the payments provided for in this Paragraph.

(Id. at ¶ 7).

Batra's employment agreement with Estee Lauder also contains a confidentiality provision, which states:

> You recognize that the Company's Confidential Information is extremely valuable to it and that disclosure or use of Confidential information outside the Company could irreparably damage the Company. You therefore agree that you will not use any Confidential Information for any purpose other than to benefit the Company. In further-ance of that commitment you will disclose Confidential Information to other persons within the Company only if they have a need to know the information in order to perform their job responsibilities for the Company and will not disclose Confidential Information to any person outside the Company . . . . You understand and agree that your confidentiality obligations under this para-graph will continue after termination of your employment with the Company, regardless of the reason for the termination, as long as the information is not generally known to the public.

(Id. at ¶ 3).

Pursuant to the terms of the agreement, "Company" is defined as:

The Estee Lauder Companies Inc. or any entity in which 50 percent or more of the outstanding voting shares are owned directly or indirectly by The Estee Lauder Companies Inc.

(<u>Id.</u> at ¶ 1(a)).

The term "Competitor" is defined as:

[A]ny business that is engaged in, or is preparing to become engaged in, the cosmetics, skin care, hair care, toiletries or fragrance business or other business in which the Company is engaged or preparing to become engaged, or that otherwise competes with, or is preparing to compete with, the Company.

(<u>Id.</u> at ¶ 1(b)).

Pursuant to the agreement, "Confidential Information":

Means information concerning the Company that is disclosed to you or otherwise learned by your as a result of your employment by the Company that is not generally known by Competitors, including, but not limited to, such information concerning: research and development, trade secrets, sales, products, services, accounts, customers, purchasers of the Company's products, marketing, packaging, merchandising, distribution, manufacturing, finance, technology, intellectual property (patents, design patents, trademarks, trade dress, copyrights), strategies, business structures, operations or ventures or other business affairs or plans.

(<u>Id.</u> at ¶ 1(c)).

Finally, the Non-compete Agreement contained a choice of law provision, which states:

> This agreement shall be governed by, and construed and interpreted in accordance with, the laws of the State of New York without regard to the conflict of law rules thereof.

(Id. at ¶ 15).

## IV. Batra's Possession of Trade Secrets

Batra admits that among his responsibilities as brand manager of R+F and as General Manager for Darphin, North America, he was in charge of developing strategies for the brands of these companies. (Hearing Trans. 03/22/06 at 24). He further admits that with respect to R+F products, he has a general idea of the plans for launch of new products, including the marketing and geographic plans and the channels of distribution for these products, over the next six to nine months. (Id.)

On January 18, 2006, a yearly brand strategy meeting was held in New York for the R+F brand. Present at the meeting was William Lauder, the chief executive officer of Estee Lauder; Dan Brestle, the chief operating officer of Estee Lauder; Rick Kunes; and Patrick Bousquet-Chavanne ("Bousquet-Chavanne"), Group President of Estee Lauder Companies, Inc. (Hearing Trans. 03/23/06

at 20). Via videolink, from San Francisco were also, Batra, Annie Jackson, and Suzie Henricks. (Hearing Trans. 03/23/06 at 20-21).

For this meeting, Batra prepared a yearly brand strategy exercise (Exhibit 20) which set forth a review of the future of the business and forward-looking plans concerning business development, investment, geographic expansion, and new product development. (Hearing Trans. 03/23/06 at 21). In addition, the brand strategy exercise presented confidential information regarding product launches for fiscal years 2006, 2007, 2008. (Hearing Trans. 03/23/06 at 21).

Documents introduced at the R+F brand strategy meeting, which were prepared by Batra during his employment with Estee Lauder, were submitted for consideration on this motion. (Exhibit 20). Contained in these documents is confidential information regarding twelve new products that are presently in the pipeline. (Id.) In addition the documents contained the confidential geographic plans for R+F over the next two to three years.

On January 18, 2006, a yearly brand strategy meeting was also held for the Darphin brand. (Hearing Trans. 03/23/06 at 23). Batra did not attend the meeting. (Id.) However, he was given direct access to the plan following the meeting, which also contained confidential information regarding new marketing

activities and new product development planned for the next three years. (Id.)

Additionally, Batra was privy to all of the information surrounding Darphin's upcoming marketing and product development strategies for Darphin. (Exhibit 24). According to Bousquet-Chavanne, Batra has "the road map in terms of expenses and investments that [Estee Lauder is] planning to put behind [its] development for the Darphin brand . . . and the expected revenues from those investments." (Hearing Trans. 03/23/06 at 31). Batra was also responsible for preparing a plan of potential accounts the Darphin brand would seek to enter over the next twelve months. (Exhibit 35; Hearing Trans. 03/23/06 at 32).

## V. **Batra's Departure**

In fall of 2006, Batra began discussing an opportunity at Perricone with Nick Perricone. (Hearing Trans. 03/22/06). Throughout the fall, Batra met with Perricone and individuals from an investment company called, TSG Consumer Products ("TSG"). (Id.) At that time, TSG was interested in purchasing Perricone, and Batra was asked to give his opinion on how good the Perricone brand was, so that TSG could determine whether or not it would be a profitable investment. (Id.)

11

While Batra initially intended to leave Estee Lauder in November 2005, his discussions with TSG and Perricone continued into the winter of 2005 and 2006. Throughout this time, Batra routinely worked on Perricone matters during his day at Estee Lauder in breach of his duty of loyalty to Estee Lauder, preparing for upcoming meetings with TSG and Perricone and even drafting the press release for his new position with Perricone on an Estee Lauder computer (Exhibit 13). (Id.)

Additionally, during this time, Batra solicited advice and assistance on his work with Perricone from another R+F senior executive, the executive director of marketing, Annie Jackson ("Jackson"). (Id. at 21-25). There were several emails exchanged establishing that throughout this time, Batra regularly solicited Jackson to breach her duty of loyalty to Estee Lauder by assisting him on preparing for meetings with TSG and Perricone. (Id.) Both Jackson and Batra completed at least some of this work for Perricone during time that should have been devoted to Estee Lauder projects, using their Estee Lauder computers and email. On one occasion, Batra admits that he invited and brought Jackson to such a meeting. At this meeting on February 7, 2006, Batra and Jackson worked to persuade TSG that Perricone was a good brand and a good acquisition. (Id.)

The evidence in these emails also establishes that even though he never made an explicit offer of employment, Batra was

12

actively soliciting Jackson to leave her position with R+F to come
to Perricone with him. (See Exhibit 11, containing an email from
Batra to Jackson dated February 6, 2006 stating "I would drag you
with me kicking and screaming even if you didn't want to come").

Following the February 7, 2006 meeting, Batra began
creating a strategy for Perricone to begin to grow its business,
which he drafted on his Estee Lauder computer. (See Exhibit 12).

On or about March 7, 2006, Batra telephoned Bousquet-
Chavanne and informed him that he was resigning from Estee Lauder
to become the Worldwide General Manager of Perricone. (B-C Decl.
at 6). During this telephone call, Bousquet-Chavanne reminded
Batra of his obligations under the Non-compete Agreement. (Id.)
Batra acknowledged these obligations and responded that he did not
believe that Estee Lauder would be able to enforce the Non-compete
Agreement because he understood that California law does not
recognize such agreements. (Id.)

During this telephone call, Bousquet-Chavanne encouraged
Batra to provide a period of notice and to assist in a transition
before leaving the company. (Id. at 7). Following further
discussions, Batra agreed on March 10, 2006 to consider the
Company's requests that he provide assistance for a transitional
period and delay his departure date. (Id.) He indicated that he
would come to the office on Monday, March 13, 2006 at which time he

13

would contact Bousquet-Chavanne to discuss the matter further. (Id.)

Later that day, Batra sent an email to Bousquet-Chavanne at 2:40 P.M. suggesting that he would attend a meeting the following Wednesday, March 15, 2006, (see Exhibit 15), despite having already discussed with TSG and Perricone that same day the possibility of filing a lawsuit in California in the near future. In order to ensure obtaining jurisdiction in California, Batra misled Bousquet-Chavanne into thinking that he would seriously consider staying on at Estee Lauder for a transitional period, even though he admits he was ninety-five percent certain he would not return there. (Hearing Trans. 03/22/06 at 44-45). Batra admitted that it was in his interest to persuade Estee Lauder that he was continuing to negotiate in good faith so that Estee Lauder would not sue him to enforce the Non-compete Agreement in New York before he had an opportunity to file his suit against Estee Lauder in California. (Id.)

Contrary to his word, Batra did not come to the office on March 13, 2006. Rather, on Monday, March 13, 2006, Batra tele- phoned Bousquet-Chavanne and informed him that he was confirming his resignation, effective the prior Tuesday, March 7, 2006. On that same day, Batra and Perricone commenced a lawsuit in Califor- nia state court seeking a declaratory judgment that the Non-compete Agreement is unenforceable under California law.

14

Batra began employment as President of Perricone on Tuesday, March 14, 2006. (Hearing Trans. 03/22/06 p. 8). In the course of the proceedings, he agreed to refrain from taking up his Perricone position until the resolution of the instant motions.

## VI. **Perricone Competes Directly with R+F and Darphin**

All R+F products are conceived in association with two doctors, Doctors Rodan and Fields. All R+F products are based on medicines with are delivered in the products in non-prescription strengths.

Perricone products are also developed by a dermatologist, Dr. Perricone, and as with R+F, the name of the dermatologist appears on the packaging.

While employed by Estee Lauder, Batra prepared a direct competitive assessment of R+F's Project Instant, a pending product in full development, and Perricone's active tinted moisturizer, an analysis which reflects Batra's personal understanding while employed with Estee Lauder that R+F and Perricone are competitors.

Exhibits 1, 2, and 3 demonstrate that R+F and Darphin products are in direct competition with Perricone products in California department stores. (Hearing Trans. 03/22/06 p. 9-11). Batra admitted that at the Nordstrom department store in San

15

Francisco, the R+F display is located directly adjacent to the Perricone display, a positioning that reflects their head-to-head competition in that store. Similarly, at the Bloomingdales in Century City, the R+F and Perricone displays also are located side-by-side, and in the Nordstrom Department Store on the west side of Los Angeles, the side-by-side positioning of R+F and Perricone products reflects that they are direct competitors.

Exhibit 38 also indicates that Perricone is closely competitive with R+F in terms of price point. Both brands offer exclusive, clinical products that are sold for similar prices. (Exhibit 38). While Darphin offers cosmetic, rather than clinical products, it too competes with Perricone in that its products are priced similarly. (Id.)

## Discussion

### I. Defendant's Motion for Abstention is Denied

#### A. The Abstention Standard

Defendant Batra seeks to invoke the abstention doctrine and requests that the action currently pending before this Court either be dismissed or stayed pending the resolution of California state litigation involving the same issues. Because extraordinary circumstances have not been established, the motion is denied.

16

Generally speaking, "federal courts have a 'virtually unflagging obligation' to exercise their jurisdiction." Burnett v. Physician's Online, Inc., 99 F.3d 72, 76 (2d Cir. 1996) (quoting Colorado River, 424 U.S. at 817). The abstention doctrine is a narrow exception to the duty of a district court to adjudicate a controversy properly before it when parallel state proceedings[1] are ongoing upon a finding of "exceptional circumstances" that warrant it. Colorado River, 424 U.S. at 813. The parties are in agreement that the principles of Colorado River and Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 103 S. Ct. 927, 74 L. Ed. 2d 765 (1983), define such "exceptional circumstances." To determine whether Colorado River abstention is appropriate, the district court must weigh six factors, with the balance heavily weighted in favor of the exercise of jurisdiction. Burnett, 99 F.3d at 76 (quoting Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 16, 74 L. Ed. 2d 765, 103 S. Ct. 927 (1983)). The six specific factors to be considered include:

---

[1] Federal and state proceedings are concurrent or parallel for purposes of abstention when the proceedings are essentially the same; that is, there is an identity of parties, and the issues and relief sought are the same, Manna v. Greenburgh No 11 School Dist., 2 F. Supp. 2d 461 (S.D.N.Y. 1998) (citations omitted). Estee Lauder and Batra are in both actions. Perricone and John Does are additional parties in the California Action. While there is not complete identity of parties in the two actions, the presence of additional parties in one action "does not render the proceedings non-parallel." Mouchantaf v. Int'l Modeling and Talent Ass'n, 368 F. Supp. 2d 303, 306 (S.D.N.Y. 2005). As in Mouchantaf, here "the gravamen of the two actions is virtually identical," id., as the issues in both proceedings involve the enforceability of the non-compete agreement, and the parties seek the same relief in both courts. Accordingly, this action and the one commenced in California are deemed parallel.

17

1. the assumption of jurisdiction by either court over any res or property,

2. inconvenience of the federal forum,

3. avoidance of piecemeal litigation,

4. the order in which jurisdiction was obtained,

5. whether state or federal law supplies the rule of decision, and

6. whether the state court proceeding will adequately protect the rights of the party seeking to invoke federal jurisdiction.

See Burnett, 99 F.3d at 76.

As the Supreme Court has noted, "no one factor is necessarily determinative." Colorado River, 424 U.S. at 818. The six factors do not present a mechanical or exhaustive checklist. Rather, "the weight to be given to any one factor may vary greatly from case to case, depending on the particular setting of the case." Moses H. Cone, 460 U.S. at 16. The district court is obligated to undertake a careful balancing of the applicable factors, but the decision to abstain is in the sound discretion of the district court. See Arkwright-Boston Mfrs. Mut. Ins. Co. v. City of New York, 762 F.2d 205, 210 (2d Cir. 1985). As this Court has noted, the federal courts frequently follow Colorado River by abstaining from exercising jurisdiction in deference to parallel state actions. See Mann v. Alvarez, No. 96 Civ. 2641 (RWS), 1996 U.S. Dist. LEXIS 13789, 1996 WL 535540, at *2 (S.D.N.Y. Sept. 20,

18

1996) (citing <u>Weinstock v. Cleary, Gottlieb, Steen & Hamilton</u>, 815
F. Supp. 127, 131 (S.D.N.Y. 1993)).

## B. The Balance of Colorado River Factors Does Not Weigh in Favor of Abstention

The first factor to be considered -- jurisdiction over a
res -- points toward the exercise of jurisdiction, as this case
does not involve a res or property over which this Court has
assumed jurisdiction. <u>See</u> <u>Woodford v. Comty. Action Agency of
Greene County, Inc.</u>, 239 F.3d 517, 522-23 (2d Cir. 2001) (noting
that "the absence of a res point[s] toward exercise of federal
jurisdiction)."

With respect to the inconvenience of the federal forum,
this factor is largely neutral. Batra spent his entire tenure with
Estee Lauder working in California. As such, much of the evidence
relating to his employment and the transfer or not of trade secrets
is likely located in California. However, by the same token, Estee
Lauder's headquarters and principal place of business are located
in New York. Batra reported to high level management in New York
and was responsible for two brands with significant functions based
out of New York. As such, many of the witnesses are also located
in New York, as is evidence relating to whether or not Estee Lauder
and Perricone are competitors.

19

It is well-settled that the third factor, the avoidance of piecemeal litigation, is the paramount consideration. See Arkwright-Boston, 762 F.2d at 211; American Alliance Ins. Co. v. Eagle Ins. Co., 961 F. Supp. 652, 656 (S.D.N.Y. 1979). As this Circuit said in Arkwright-Boston:

As the suits all arise out of the [same set of facts], they should be tried in one forum. Maintaining virtually identical suits in two forums under these circumstances would waste judicial resources and invite duplicative effort. Plainly, avoidance of piecemeal litigation is best served by leaving these suits in the state court.

Arkwright-Boston, 762 F.2d at 211.

Batra argues that the federal and state actions contain issues which are inextricably linked. In addition, Batra points out that the state action is more comprehensive, as it involves fifty John Doe defendants not present in the federal action. Accordingly, there is some risk of inconsistent result; the federal court could reach a determination of common issues which would not bind parties present only in the state court action. In this respect, the risk of piecemeal litigation does weigh in favor of abstention.

However, as this Court has previously noted, "[a] risk of inconsistent results alone will not outweigh the heavy presumption against abstention." In re Asbestos Litig., 963 F. Supp. 247, 253 (S.D.N.Y. 1997). Indeed, as "any case involving parallel proceed-

20

ings presents a risk of duplicative litigation or a rush to judgment, the existence of those risks can weigh only modestly in favor of dismissal; otherwise dismissals pursuant to Colorado River would be the rule, not the exception, in cases involving parallel proceedings in state and federal court." Id. (quoting King v. Hahn, 885 F. Supp. 95, 98 (S.D.N.Y. 1995); National Union Fire Ins. Co. Of Pittsburgh v. Thomas, 713 F. Supp. 62, 66 (S.D.N.Y. 1995)).

In arguing that the risk of piecemeal litigation warrants abstention, Batra relies heavily on a somewhat analogous case, Mouchantaf, in which the Honorable Miriam Cedarbaum exercised her discretion to abstain. In Mouchantaf, an employer filed suit to enforce a non-compete agreement in Arizona state court. Three months later, the employee filed a parallel suit in New York state court for a declaratory judgment that the non-compete agreement was not enforceable, which action was subsequently removed to federal court. Although the instant case presents a risk of piecemeal litigation similar to that confronted in Mouchantaf, the remaining Colorado River factors do not tip in favor of abstention, as they did in that case. Most notably, in the Arizona state action in Mouchantaf, discovery had been conducted and answers, counterclaims, and motions to dismiss had been filed, rendering the fourth Colorado River factor significantly in favor of abstention. Here, on the other hand, neither action has progressed significantly.

21

The fourth factor, the order in which jurisdiction was obtained and the progress of each action, is neutral. In assessing the fourth factor, courts "look not only to which action was commenced first, but rather to the relative progress of the actions in the two forums." Am. Alliance Ins. Co. V. Eagle Ins. Co., 961 F. Supp. 652 (S.D.N.Y. 1997). Accordingly, while the California state action was filed two days before the federal action, the progress of the two actions is substantially equal, and therefore this factor is neutral.[2]

With respect to the fifth factor, whether or not state or federal law provides the rule of decision, Batra argues that the absence of a federal question of law favors abstention. However, the Second Circuit has noted specifically that "although the presence of federal issues strongly advises exercising federal jurisdiction, the absence of federal issues does not strongly advise dismissal, unless the state law issues are novel or

---

[2] Plaintiff argues that the federal action has progressed farther along than the state action, and that the fourth factor therefore favors the exercise of jurisdiction. According to plaintiff, in the instant action, discovery commenced and hearing on the preliminary injunction was conducted while in the state proceeding, there has been no answer filed, no scheduling order, and no discovery. While such facts ordinarily may weigh against abstention, see, e.g., In Re Asbestos Litig., 963 F. Supp. at 253, Batra filed his motion for abstention before discovery proceeded or the preliminary injunction hearing took place. The Court determined to resolve both motions simultaneously, permitting the hearing on the preliminary injunction to proceed, with the understanding that the progress of the federal action would not be used to prejudice Batra in the determination of the abstention motion. Therefore, plaintiff's argument as to the fourth factor is not credited, and the progress of the instant action plays no role in the Court's determination that abstention is not warranted.

22

particularly complex." Village of Westfield v. Welch's, 170 F.3d 116, 124 (2d Cir. 1999) (citations omitted). Batra has failed to demonstrate how the issues implicated in this case present complex or unique questions. Indeed, the extensive body of Second Circuit district court cases upon which both parties rely indicates that federal courts are well-versed in handling cases involving the enforceability of covenants not to compete. Therefore, it is determined that the absence of federal issues does not weigh in favor of abstention, and this factor "militates against abstention in light of the presumption of federal jurisdiction." Manna v. Greenburgh No. 11 Sch. Dist., 2 F. Supp 2d 461, 469 (S.D.N.Y. 1998); see also Village of Westfield, 170 F.3d at 122 ("[W]here the federal court is just as convenient as the state court, that factor favors retention of the case in federal court.").

Finally, the sixth factor presents the question of whether the California court can adequately protect Estee Lauder's interests. It is concluded that the California court can adequately protect Estee Lauder's interests, as Estee Lauder can assert its claims here as counterclaims in that action.

Estee Lauder argues that the sixth factor weighs against abstention, arguing that the California state court would be unable to hold a hearing and grant preliminary relief as expeditiously as this Court. This Court sees no reason to question the ability of

the California court to protect Estee Lauder's substantive and procedural rights in an efficient and prompt manner.

Nevertheless, the ability of the California court to adequately protect Estee Lauder's interests renders the sixth factor largely neutral. "Although any possible inadequacy of the state forum to protect the federal plaintiff's rights would provide a strong reason to exercise federal jurisdiction, the adequacy of the state forum does not weigh heavily in favor of dismissal pursuant to Colorado River." In re Asbestos Litig., 963 F. Supp. at 253 (quoting King, 885 F. Supp. at 98).

In light of the foregoing analysis regarding the Colorado River factors and consideration of the heavy presumption favoring exercise of jurisdiction, the Court finds that the "extraordinary circumstances" required for abstention by Colorado River are not present here. Accordingly, Batra's motion for abstention is denied.

## II.  Plaintiff's Motion for a Preliminary Injunction is Granted

### A.  Preliminary Injunction Standard

A preliminary injunction is an "extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion."  Mazurek v.

24

Armstrong, 520 U.S. 968, 972, 117 S. Ct. 1865, 138 L. Ed. 2d 162
(1997) (emphasis in original) (quoting 11A C. Wright, A. Miller, &
M. Kane, Federal Practice and Procedure § 2948, pp. 129-130 (2d
ed.1995)). In the ordinary case,

> a preliminary injunction may be granted only when the
> party seeking the injunction establishes that "1) absent
> injunctive relief, it will suffer irreparable harm, and
> 2) either a) that it is likely to succeed on the merits,
> or b) that there are sufficiently serious questions going
> to the merits to make them a fair ground for litigation,
> and that the balance of hardships tips decidedly in favor
> of the moving party."

No Spray Coalition, Inc. v. City of New York, 252 F.3d 148, 150 (2d
Cir. 2001) (quoting Otokoyama Co. Ltd. v. Wine of Japan Import,
Inc., 175 F.3d 266, 270 (2d Cir.1999)).

## B.  Choice of Law

As a threshold matter, the Court first must determine
which state's law controls -- New York's or California's.  As a
court is to apply the choice-of-law rules prevailing in the state
in which the court sits, see, Klaxon Co. v. Stentor Elec. Mfg. Co.,
313 U.S. 487, 496, 85 L. Ed. 1477, 61 S. Ct. 1020 (1941), New York
law governs the choice of law determination.

Although New York recognizes the "choice of law principle
that parties to a contract have a right to choose the law to be
applied to their contract, this freedom of choice on the part of

25

the parties is not absolute." S. Leo Harmonay, Inc. v. Binks Mfg. Co., 597 F. Supp. 1014, 1025 (S.D.N.Y. 1984), aff'd 762 F.2d 990 (2d Cir. 1985) (internal citation omitted). To determine the appropriateness of the parties' choice of law, New York follows the "substantial relationship" approach, as stated in Restatement (Second) of Conflicts of Law § 187:

(2) The law of the state chosen by the parties to govern their contractual rights and duties will be applied . . . unless either

(a) the chosen state has no substantial relationship to the parties . . . or

(b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state . . .

Leo Harmonay, 597 F. Supp. at 1025; see also Levine v. Arabian American Oil Co., 1985 U.S. Dist. LEXIS 13386, 84 Civ. 2396, 1985 WL 3945, at *3-*4 (S.D.N.Y. Nov. 27, 1985); Southern Int'l Sales. Co. v. Potter & Brumfield Division, 410 F. Supp. 1339, 1342-43 (S.D.N.Y. 1976) (Weinfeld, J.).

Generally, "[u]nder New York law . . . a contract's designation of the law that is to govern disputes arising from the contract . . . is determinative if the state has sufficient contacts with the transaction." Zerman v. Bald, 735 F.2d 15, 20 (2d Cir. 1984) (citations omitted). However, there is an exception to this rule when "application of the law of the chosen state would

26

be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state." Leo Harmonay, 597 F. Supp. at 1025. For this exception to apply, "the issue [must be] of such overriding concern to the public policy of another jurisdiction as to override the intent of the parties and the interest of [New York] in enforcing its own policies." Marine Midland Bank, N.A. v. United Missouri Bank, N.A., 223 A.D.2d 119, 123-24, 643 N.Y.S.2d 528, 531 (1st Dep't 1996).

In other words, three conditions must be met in order to override the intent of the contracting parties. First, Batra must establish that in the absence of the choice of law provision, California law would apply. Second, he must demonstrate that the application of New York law would be contrary to a fundamental policy of California. Third, Batra must demonstrate that California has a materially greater interest than New York in the determination of this dispute.

Batra argues, in essence, that irrespective of the presence of the New York forum selection clause in the contract, California law should apply due to the presence of significant contacts in California and to California's strong public policy against the enforcement of non-compete agreements.

For the first element of the inquiry, New York courts employ the "substantial relationship" test. "The New York Court of

27

Appeals has addressed the 'substantial relationship' approach and held that while the parties' choice of law is to be given heavy weight, the law of the state with the 'most significant contacts' is to be applied." Agricultural Ins. Co., Inc. v. Ace Hardware Corp., 98 Civ. 8708, 2003 U.S. Dist. LEXIS 711, 2003 WL 164272, at *5 (S.D.N.Y. Jan. 17, 2003) (quoting Haag v. Barnes, 9 N.Y. 2d 554, 559-60, 216 N.Y.S. 2d 65, 175 N.E.2d 441 (1961)); see also Cargill, Inc. v. Charles Kowsky Resources, Inc., 949 F.2d 51, 55 (2d Cir. 1991) ("New York law allows a court to disregard the parties' choice when the 'most significant contacts' are in another state.") (quoting Haag, 9 N.Y.2d at 560); Walter E. Heller & Co. v. Video Innovations, Inc., 730 F.2d 50, 52 (2d Cir. 1984) (same).

In support of his argument, Batra cites Prod. Resource Group L.L.C. v. Oberman, No. 03 Civ. 5366 (JGK), 2003 WL 22350939 (S.D.N.Y. 2003), in which the Honorable John G. Koeltl found that in the absence of the choice of law provision, California law would apply, based upon the following:

> The non-competition provision was included in a contract pursuant to which Oberman worked primarily in California. During his tenure, his base was in California, and he spent far more time in California than he did in New York on his few trips there. He was paid for most of his tenure by the California subsidiary of PRG. Both Oberman's work under his employment agreement . . . and the work he now seeks to do is centered in California.

28

Oberman, 2003 WL 22350939, at *10. According to Batra, the facts here are analogous to those presented in Oberman, and therefore California law should apply.

While there are similarities between the facts here and those presented in Oberman, there are significant contacts to New York present in this case that were not present in Oberman. First, although, as in Oberman, Batra was a resident of California and was hired by a New York based employer to work in California, the work Batra did was not entirely "centered" in California. Rather, Batra was responsible for R+F's business worldwide and for Darphin's business throughout North America. Furthermore, while there are California components to the employment relationship, many of the significant functions for both brands are located in New York, including Corporate Administration, Creative/Names/Copy, Finance, Product Development, Packaging Development, Regulatory, Legal, Operations, Manufacturing, Shipping, Forecasting, Information Services, Human Resources, Press Relations, Customer Service, and the Internet Division, while Sales and Marketing are directed out of California. Batra retained responsibility for all or many of these functions as to both brands, and New York personnel perform-ing these functions for R+F and Darphin worked under Batra's management. Additionally, unlike in Oberman, Estee Lauder's principal place of business, and not simply its headquarters, is located in New York, and Batra's paychecks were issued from New York.

29

The facts underlying this case are also distinguishable from those in SG Cowen Securities Corp. v. Messih, No. 00 Civ. 3228 (HB), 2000 WL 633434 (S.D.N.Y. May 17, 2000), aff'd, 224 F.3d 79 (2d Cir. 2000)[3], upon which Batra also relies. As in Oberman, the contacts in Messih were found to be weighted toward California, although the Plaintiff employer's headquarters were in New York (but not his principal place of business) and some contract negotiations occurred in New York. Id. at *4. In Messih, Messih was hired to serve as the Managing Director of Technology in the Corporate Finance division of plaintiff's San Francisco office. Id. As such, even from SG Cowen's perspective, the work Messih did for the company had little to no relationship with New York. Here, in contrast, Batra was not hired to run a California office of Estee Lauder. The fact that Batra literally carried out many of his duties from California does not overcome the fact that work itself was the management of a New York-based brand with predominantly New York-based employees. Accordingly, while this may be a close call, it is not the situation present in Oberman or Messih.

---

[3] It is worth noting that the holding in Messih did not address whether California's fundamental policy against the enforcement of restrictive covenants warranted the application of California law. Rather, the district court focused exclusively on which states' contacts predominated, holding that because California's did, California possessed a materially greater interest. See Messih, 2000 WL 633434, at *4. Additionally, in affirming the denial of the preliminary injunction in Messih, the Second Circuit did not address the district court's determination that California's law should apply, but rather noted only generally "the many hurdles" Cowen faced in demonstrating a likelihood of success. Messih, 224 F.3d at 84.

30

Based on the foregoing, while Batra's employment relationship does not overwhelmingly point to New York, the management and control of Estee Lauder is entirely in New York, and a significant portion of Batra's responsibilities were centered in New York. Therefore, the totality of the number of contacts in New York well exceeds those present in Oberman and SG Cowen.

With respect to whether the application of New York law is contrary to a fundamental policy of California, Section 16600 of the California Business and Professions Code provides that "every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void." Cal. Bus. & Prof. Code § 16600. California and New York courts have held that Section 16600 reflects a "strong public policy" of California. See, e.q., Oberman, 2003 WL 22350939, at *10 (citing Application Group, Inc. v. Hunter Group, Inc., 61 Cal. App. 4th 881, 900, 72 Cal. Rptr. 2d 73 (1998); Frame v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 20 Cal. App. 3d 668, 673, 97 Cal. Rptr. 811 (1971); Latona v. Aetna U.S. Healthcare, Inc., 82 F. Supp. 2d 1089, 1093-94 (C.D. Cal. 1999); Scott v. Snelling & Snelling, Inc., 732 F. Supp. 1034, 1042 (N.D. Cal. 1990)).

Indeed, "California courts have held that 'the interests of the employee in his own mobility and betterment are deemed paramount to the competitive business interests of the employers, where neither the employee nor his new employer has committed any

31

illegal act accompanying the employment change.'" <u>Id.</u> (quoting <u>Metro Traffic Control, Inc. v. Shadow Traffic Network</u>, 22 Cal. App.4th 853, 860, 27 Cal. Rptr. 2d 73 (1994)).

Because, pursuant to California's fundamental policy against the enforcement of restrictive covenants, non-compete agreements, such as the one at issue in this case, are declared null and void under California law, the enforcement of Batra's agreement by this Court would be contrary to a fundamental policy of California, notwithstanding Estee Lauder's contention that there is no conflict between California's policy and the application of New York law.[4] <u>See</u> <u>Oberman</u>, 2003 WL 22350939, at *10 (concluding

---

[4] Estee Lauder contends that the application of New York law would not be contrary to a fundamental policy of California on the grounds that the policies underlying the unfair competition rules of New York and California do not run contrary to one another. In essence, Estee Lauder argues that it is the policy of both states that: (1) employees have a duty of loyalty to their employer; (2) an employer's trade secrets shall be safeguarded from unfair competition arising from misappropriation both during and after an employment relationship; and (3) employees should generally be free to pursue the occupation of their choosing. To the extent that the policies of New York and California do overlap, Estee Lauder's reliance on such similarities is misplaced. The second prong of the choice of law analysis asks not whether the policy of California conflicts with the policy of New York, but rather whether the <u>application of New York law</u> would run contrary to California's fundamental policy. Irrespective of whether New York's general policies overlap with those of California, the fact remains that the enforcement of the restrictive covenant at issue under New York law would run contrary to California's policy against such enforcement. Indeed, as Plaintiff notes, "under New York's policy, a slightly different balance is struck," (Pl. Mem. L. In Supp. Mot. For PI p. 8), allowing for the enforcement of restrictive covenants under certain circumstances where reasonable in time and geographic scope. Therefore, when the application of this policy balances toward the enforcement of a non-compete agreement, that application runs contrary to California's fundamental policy.

32

that the "fundamental policy of a state [California] which has a materially greater interest than the chosen state" warranted the application of California law despite the contractual provision that New York law would govern). Although restrictive covenants are enforceable under California law where there has been a misappropriation of trade secrets, Estee Lauder has not demonstrated that to date there has been such a misappropriation. Absent such a showing, the Non-compete Agreement would not be enforceable under California law. However, in spite of the fact that the application of New York law would run contrary to the fundamental policy of California, it is concluded that California's interest in this dispute is not materially greater than that of New York and that therefore, New York law shall apply.

Because, as set forth above, the contacts point toward New York, it is concluded that California's interest is not materially greater than that of New York. Just as California has a strong interest in protecting those employed in California, so too does New York have a strong interest in protecting companies doing business here in keeping with:

New York's recognized interest in maintaining and fostering its undisputed status as the preeminent commercial and financial nerve center of the Nation and the world. That interest naturally embraces a very strong policy of assuring ready access to a forum for redress of injuries arising out of transactions spawned here. Indeed, access to a convenient forum which dispassionately administers a known, stable, and commercially sophisticated body of law may be considered as much an attraction to conducting

33

business in New York as its unique financial and communi-
cations resources.

Marine Midland, 223 A.D.2d at 124 (internal citations omitted).

Accordingly, based upon New York's policy of enforcing
restrictive covenants that are reasonable in time and scope and
given New York's interest in having a predictable body of law that
companies can rely on when employing individuals who will have
close contact with trade secrets and confidential information, it
is concluded that California's interest is not "materially greater"
than New York's.

## C. Estee Lauder Has Demonstrated Irreparable Harm

"Perhaps the single most important prerequisite for the
issuance of a preliminary injunction is a demonstration that if it
is not granted the applicant is likely to suffer irreparable harm
before a decision on the merits can be rendered." Citibank, N.A.
v. City Trust, 756 F.2d 273, 275 (2d Cir. 1985). Irreparable harm
is that injury which is so serious that "a monetary award cannot be
adequate compensation." Id. at 275; see also Warner-Lambert Co. v.
Northside Development Corp., 86 F.3d 3, 8 (2d Cir. 1996) (irrepara-
ble harm requirement may be met by showing that harm is unquantifi-
able in monetary terms). In order to demonstrate irreparable
injury the movant must show "an injury that is neither remote nor
speculative, but actual and imminent and cannot be remedied by an

34

award of monetary damages." Earthweb, Inc. v. Schlack, 2000 U.S. App. LEXIS 11446, at *5-6 (2d Cir. May 18, 2000) (finding plaintiff's showing insufficient to warrant a preliminary injunction where they failed to demonstrate that defendant had removed proprietary documents or information or was about to violate his duties under the agreement).

Irreparable harm is presumed where a trade secret has been misappropriated because, as the Court of Appeals for the Second Circuit has explained, "[a] trade secret once lost is, of course, lost forever" and, therefore, such a loss "cannot be measured in money damages." FMC Corp. v. Taiwan Tainan Giant Indus. Co., 730 F.2d 61, 63 (2d Cir.1984). Even where a trade secret has not yet been disclosed, irreparable harm may be found based upon a finding that trade secrets will inevitably be disclosed where, as here, "the movant competes directly with the prospective employer and the transient employee possesses highly confidential or technical knowledge concerning [] marketing strategies, or the like." Earthweb, Inc. v. Schlack, 71 F. Supp. 2d 299, 309 (S.D.N.Y. 1999).

It is concluded that Estee Lauder has carried its burden of demonstrating irreparable injury for the following reasons. First, if Batra does misappropriate Estee Lauder's trade secrets, it would be "very difficult to calculate the monetary damages that would successfully redress the loss," Ticor Title Insurance Co. v.

35

Cohen, 173 F.3d 63, 68-69 (2d Cir. 1999), given the difficulty in ascertaining empirically how much of a competitive advantage such information gives Perricone and/or how much detriment it might cause to the future profitability of R+F and/or Darphin products. See Shipley Co. v. Clark, 728 F. Supp. 818, 827 (D. Mass. 1990) ("the task of quantifying the consequences of violating a non-competition clause is a particularly difficult and elusive one"). Additionally, as in Ticor, the employment agreement between Batra and Estee Lauder "concedes that in the event of breach of the post-employment competition provision, [Estee Lauder] shall be entitled to injunctive relief, because it would cause irreparable injury." (See Bousquet-Chavanne Decl., Exhibit B, ¶ 13.) As in Ticor therefore, the agreement's language "might arguably be viewed as an admission by [Batra] that plaintiff will suffer irreparable harm were he to breach the contract's non-compete agreement." Ticor, 173 F.3d at 69.

Batra contends that Estee Lauder has not demonstrated irreparable injury, but rather simply has speculated about the possibility that Batra will use the alleged confidential business information. According to Batra, Estee Lauder cannot satisfy this requirement because: (1) Batra does not have any technical expertise; (2) Perricone and Batra do not care about Plaintiff's technology as Perricone and Estee Lauder are not competitors; and (3) Batra has eliminated any risk of misappropriation of trade

secrets by stipulating that he will be completely divorced from new product development in his position at Perricone.

With respect to the first contention, Batra's lack of technical expertise says nothing about whether or not Batra possesses trade secrets and/or protected confidential information. Under New York law, trade secrets are defined as set forth in the Restatement of Torts § 757, comment b (1939), which states that:

A trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives [the owner] the opportunity to obtain an advantage over competitors who do not know or use it.

Softel, Inc. v. Dragon Med. & Scientific Commc'ns, Inc., 118 F.3d 955, 968 (2d Cir. 1997). New York courts consider several factors in determining whether information constitutes a trade secret, including: (1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the business to guard the secrecy of information; (4) the value of the information to the business and its competitors; (5) the amount of effort or money expended by the business in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others. See North Atlantic Instruments, Inc. v. Haber, 188 F.3d 38, 44 (2d Cir. 1999).

37

In determining whether something has trade secret status, "[t]he most important consideration is whether the information was secret." Price lists, product samples, and "marketing plans" are all items that are not, as a matter of law, protected as trade secrets. Gemmy Indus. Corp. v. Crisha Creations Ltd., No. 04 Civ.1074 (RWS), 2004 WL 1406075, at * 12 (S.D.N.Y. June 23, 2004); Great Lakes Carbon Corp. v. Koch, 497 F. Supp. 462, 470 (S.D.N.Y. 1980); see also Tactica Int'l, Inc. v. Atlantic Horizon Int'l, Inc., 154 F. Supp. 2d 586, 607 (S.D.N.Y. 2001) (information the plaintiff sought to claim as trade secret -- information concerning the references of its customers -- could easily be recalled by the defendants or obtained by contacting the customers directly and was not a trade secret). Similarly, an employee's "knowledge of the intricacies of [his former employer's] business operation" does not enjoy trade secret status. Reed, Roberts Assocs., Inc. v. Strauman, 40 N.Y.2d 303, 309, 386 N.Y.S.2d 677 (1976).

Under this standard, Estee Lauder has established that Batra possesses trade secrets. The fact that Batra was not the scientist behind the formulas and the development of new products bears not on whether or not Estee Lauder has carried its burden of demonstrating irreparable injury. PepsiCo, Inc. v. Redmond, 54 F.3d 1262, 1270 (7th Cir.1995) (noting that even though it is not the typical case, strategic information regarding price, distribution, and marketing nevertheless falls within the realm of trade secret protection). Even if, as he contends, Batra knew no more

38

about the components or technologies of Estee Lauder products than "the average consumer who can read the product ingredient label," (Batra Decl. ¶ 25), it is conceded that he was responsible for developing the R+F brand strategies for the 2007 and 2008 fiscal years and was intimately involved in developing the Darphin brand strategies for the same time period. Moreover, his deposition testimony, as laid out above, also indicates that Batra was knowledgeable more than just marketing plans. He was knowledgeable about confidential products currently under development and product innovations scheduled for the coming years. Additionally, Batra has confidential information about the stage of development of products in the pipeline, wholly apart from specific secrets concerning its process, which is entitled to protection. See Eastman Kodak Co. v. Powers Film Products, 179 N.Y.S. 325, 330 (holding employer entitled to protection against disclosure to its competitor of the stage of its product development).

Finally, Batra seeks employment with a direct competitor of Estee Lauder. As such, it is concluded that, as in Monovis, Inc. v. Aquino, 905 F. Supp. 1205, 1234 (W.D.N.Y. 1994), "even assuming the best of good faith, it is doubtful whether the defendant could completely divorce his knowledge of the trade secrets from any . . . work he might engage in."

As to Batra's second argument, it is concluded that an individual's assertion that he "really doesn't care" about his

39

former employer's trade secrets is not sufficient to overcome a demonstration of irreparable harm. As evidenced by the record in this case, Batra no longer feels allegiance to his former employer. Prior to leaving the company, he spent company time negotiating the terms of his new employment agreement with Perricone and solicited help on Perricone matters from another senior executive of Estee Lauder without regard to his and her obligations under their employment agreements or to the duty of loyalty they both owed Estee Lauder. As such, Estee Lauder should not be required to rely on Batra's characterization of the usefulness of the information he obtained while employed there.

Additionally, it might be argued that even if Batra had not shown himself to be lacking credibility, the information he obtained while employed with Estee Lauder could not cause irreparable injury in his hands at Perricone if Perricone was not interested in Estee Lauder's information. In other words, Batra might be correct that if Perricone products did not compete with R+F and Darphin products, Estee Lauder would face much greater difficulty carrying its burden of demonstrating irreparable injury. However, because it is concluded that Perricone products do compete with those of R+F and Darphin, this argument is inapposite.

Finally, Batra's stipulation that he will be divorced completely from product development for a short time period at Perricone also is not sufficient to overcome Estee Lauder's showing

40

of irreparable injury. As noted, Batra has not proven the most trustworthy in the fulfillment of his obligations owed Estee Lauder. See PepsiCo, 54 F.3d at 1270 (holding the risk of inevitable disclosure further supported by the former employee's "lack of forthrightness" and "out and out lies"). Moreover, as stated above, the trade secrets Batra possesses are not limited to product formulas. Therefore the harm that could befall Estee Lauder if Batra were to misappropriate its trade secrets is not limited to a potential replication of its products, but rather could manifest as competitive advantage from knowing the when and how of Estee Lauder's future product introductions.

Accordingly, it is concluded that Estee Lauder has demonstrated that the measure of the damage caused by the misappropriation of its trade secrets is unquantifiable and that, therefore, Estee Lauder will suffer irreparable injury absent an injunction.

## D. **The Non-compete Agreement Under New York Law**

New York law subjects a non-compete covenant by an employee to "an overriding limitation of reasonableness." Karpinski v. Ingrasci, 28 N.Y.2d 45, 49, 268 N.E.2d 751, 320 N.Y.S.2d 1 (1971). Courts must weigh the need to protect the employer's legitimate business interests against the employee's concern regarding the possible loss of livelihood, a result

41

strongly disfavored by public policy in New York. See id. A covenant that is reasonable in time and geographic scope shall be enforced to the extent necessary "(1) to prevent an employee's solicitation or disclosure of trade secrets, (2) to prevent an employee's release of confidential information regarding the employer's customers, or (3) in those cases where the employee's services to the employer are deemed special or unique." Ticor , 173 F.3d at 70 (citing Purchasing Assocs. v. Weitz, 13 N.Y.2d 267, 272-73, 246 N.Y.S.2d 600, 196 N.E.2d 245 (1963)).

Batra argues that even under New York law, the Non-compete Agreement is unenforceable. First, Batra argues that the non-compete is overbroad and seeks to achieve a purpose deemed improper under New York law. Additionally, Batra claims that the agreement is unenforceable because, according to Batra, Estee Lauder has failed to establish that it can succeed on a claim for misappropriation of trade secrets, which, according to him, is required for a New York court to enforce a non-compete agreement.

## 1. The Agreement Does Not Seek to Achieve an Improper Purpose

With respect to Batra's first argument, Batra contends specifically that the Non-compete Agreement is being used for an impermissible purpose under New York law in that it seeks to insulate Estee Lauder from competition in contravention of New York's policy regarding covenants not to compete.

As set forth above, covenants not to compete are subjected to an overriding question of reasonableness, which takes particular account of the interests of employees. As Batra points out, the New York Court of Appeals has stated:

[O]ur economy is premised on the competition engendered by the uninhibited flow of services, talent and ideas. Therefore, no restrictions should fetter an employee's right to apply to his own best advantage the skills and knowledge acquired by the overall experience of his previous employment.

Reed, Roberts Assocs., Inc. v. Strauman, 40 N.Y.2d 303, 307, 386 N.Y.S.2d 677, 680 (1976). However, the Court of Appeals also has emphasized the competing interests involved in the analysis of non-compete agreements, highlighting the importance of balancing the interests of the employee and the public with those of the employer:

[T]he courts must also recognize the legitimate interest an employer has in safeguarding that which has made his business successful and to protect himself against deliberate surreptitious commercial piracy. Thus restrictive covenants will be enforceable to the extent necessary to prevent the disclosure or use of trade secrets or confidential customer information.

Reed, Roberts, 40 N.Y.2d at 308; see also Am. Broad. Cos. v. Wolf, 52 N.Y.2d 394, 404, 420 N.E.2d 363, 438 N.Y.S.2d 482 (1981) ("The rules governing enforcement of anti-competitive covenants . . . are designed to foster these interests of the employer without

43

impairing the employee's ability to earn a living or the general competitive mold of society.").

According to Batra, Bousquet-Chavanne's testimony regarding the purpose underlying the use of restrictive covenants at Estee Lauder demonstrates that they are used principally for an anti-competitive purpose. During his direct testimony, Bousquet-Chavanne stated:

Q:   And what does the noncompete protect against?

A:   The noncompete actually is a key element in pre-venting that our human capital on one side, manage-ment talent be tempted to basically join the compe-tition. We protect our management talent first and foremost ...

(Hearing Trans. 03/23/06 at 5-6). Later, on cross-examination, the witness stated:

Q:   How does it protect against management talent? Isn't it designed to keep people there?

A:   It protects existing management talent in the company, yes.

Q:   So it's designed to keep people where they are?

A:   It's designed to basically keep the people inside the other companies in terms of their career devel-opment at Estee Lauder.

Q:   And creating a barrier for them to move outside?

A:   It creates a barrier for the competition to access our talent because they know we will enforce [the] noncompete clause.

* * *

        Q:   It is not intended to be a disincentive to leave?

        A:   The primary objective is to secure the longevity of
             our management resources.

        Q:   And to do that you make it harder for them to
             leave, right?

        A:   We make it harder for our competition to approach
             them.

(Id. at 46-47).


             Additionally, Batra contends that the overbreadth of the

express terms of the covenant underscore its improper purpose.

"Competitor" is defined by the noncompete agreement as

        any business that is engaged in, or is preparing to
        become engaged in, the cosmetics, skin care, hair care,
        toiletries, or fragrance business or other business in
        which [Estee Lauder] is engaged or is preparing to become
        engaged, or that otherwise competes with, or is preparing
        to compete with, the Company.

(Exhibit B at ¶ 1(b)). As such, Batra argues that in prohibiting

him from "work[ing] for or otherwise actively participat[ing] in

any business on behalf of any Competitor," the agreement unreason-

ably bars him from working in any of the businesses engaged in by

Estee Lauder -- the world's largest cosmetic company in the

prestige beauty industry. (Id. at ¶ 4).

Initially, Batra's argument with respect to the over-breadth of the terms of the noncompete agreement ignores the qualifying language that immediately follows the word "Competitor" in the above-quoted passage. The relevant passage states in full that Batra shall "not work for or otherwise actively participate in any business on behalf of any Competitor in which [he] could benefit the Competitor's business or harm the Company's business by using or disclosing Confidential Information." (Id.) Thus, by its express terms, the covenant does not prohibit Batra from employment with all Competitors of Estee Lauder and all Estee Lauder products, but rather limits this prohibition to positions with other companies in which Batra could misuse the trade secrets and confidential information to which he became privy while employed with Estee Lauder. As such, by its very terms, the covenant would be unenforceable if enforcement was sought against Batra for leaving Estee Lauder for employment with a company that did not directly compete with R+F and Darphin -- the Estee Lauder brands in which Batra possesses knowledge of trade secrets.

With respect to Bousquet-Chavanne's testimony regarding the purpose of the Non-compete Agreement, all covenants not to compete are motivated at least in part by a company's desire to protect management talent to the extent that they are legally entitled to do so. New York law strikes a balance by permitting companies to protect their management from being lured by competitors only to the extent necessary to prevent the misuse of trade

46

secrets. See Am. Broad. Cos., 52 N.Y.2d at 404; Lucente v. IBM, 117 F. Supp. 2d 336, 348 (S.D.N.Y. 2000) ("Courts will enforce employment restrictions only to the extent necessary to protect the employer from unfair competition which stems from the employee's use or disclosure of trade secrets or confidential customer lists, or confidential customer information."). To hold otherwise would essentially invalidate all covenants not to compete -- a result New York courts obviously have not endorsed, given their longstanding dedication to the reasonableness inquiry. Accordingly, Batra's argument that the purpose of the Non-compete Agreement is pernicious to New York's policy regarding covenants not to compete is not credited.

## 2. **Estee Lauder Need Not Establish a Misappropriation of Trade Secrets**

Batra's argument with respect to Estee Lauder's failure to establish that Batra misappropriated trade secrets is two-fold. First, Batra argues that the information that Estee Lauder seeks to protect is not of trade secret status, and therefore not protectable. Second, Batra contends that Estee Lauder has failed to demonstrate that Batra has taken or used anything belonging to Estee Lauder.

For the reasons set forth above with respect to Estee Lauder's demonstration of irreparable injury, Batra's first argument is without merit. Estee Lauder has established that Batra

47

possesses information that is of trade secret status and that there
is a substantial risk of Batra disclosing this information.

As to Batra's contention that Estee Lauder has failed to
demonstrate that he has misappropriated trade secrets, such a
showing is not necessary to prevail on its claim. See, e.g.,
Pepsico, 54 F.3d at 1268 (outlining inevitable disclosure doc-
trine). While, as stated, New York courts will enforce a non-
compete agreement only to the extent necessary to protect an
employer's trade secrets, see Am. Broad. Cos., 52 N.Y.2d at 404,
this is not to say that in order to obtain such protection the
employer must demonstrate that such misappropriation has already
taken place. Rather, Estee Lauder simply need establish that there
is a risk of inevitable disclosure, as set forth above. The
misappropriation claim is a separate and distinct claim.

## 3. **Reasonableness of the Scope of the Agree-ment**

Courts assessing the reasonableness of the scope of a
restrictive covenant are to "focus[] on the particular facts and
circumstances given context to the agreement." BDO Seidman v.
Hirshberg, 93 N.Y.2d 382, 390, 712 N.E.2d 1220, 690 N.Y.S.2d 854
(1999). As such, there are no per se lines demarcating what
constitutes an unreasonable durational or geographic scope.
Rather, reasonableness will be judged by the specific facts
underlying the agreement and the nature of the employer's confiden-

48

tial information.  See Business Intelligence Services, Inc. v. Hudson, 580 F. Supp. 1068, 1072 (S.D.N.Y. 1984).

Courts need not employ an all or nothing approach to the enforcement of employee restrictive covenants.  Indeed, New York courts have "expressly recognized and applied the judicial power to sever and grant partial enforcement for an overbroad employee restrictive covenant." BDO Seidman, 93 N.Y.2d at 394, (citing Karpinski, 28 N.Y.2d at 51-52 (giving effect to portion of the covenant barring the practice of oral surgery, but declining to do so with respect to the portion of the covenant barring the practice of all dentistry)). Pursuant to this rule, partial enforcement may be justified so long as "the employer demonstrates an absence of overreaching, coercive use of dominant bargaining power, or other anti-competitive misconduct, but has in good faith sought to protect a legitimate business interest, consistent with reasonable standards of fair dealing." Id.

In determining whether a covenant not to compete is reasonable in time and geographic scope, enforcement will only be granted to the extent necessary to protect the employer's legitimate interests: "(1) to prevent an employee's solicitation or disclosure of trade secrets, (2) to prevent an employee's release of confidential information regarding the employer's customers, or (3) in those cases where the employee's services to the employer are deemed special or unique." Ticor, 173 F.3d at 70 (citing

Purchasing Assocs., 13 N.Y.2d at 272-73, 196 N.E.2d at 248, 246
N.Y.S.2d at 604).

Under New York law, the durational reasonableness of a
non-compete agreement is judged by the length of time for which the
employer's confidential information will be competitively valuable.
See, e.g., Business Intelligence Servs. Inc. v. Hudson, 580 F.
Supp. 1068, 1073 (S.D.N.Y. 1984).

An additional factor courts will look to in evaluating
the reasonableness of a restrictive covenant is whether an employee
receives continued consideration for his loyalty and good will.
See Bradford v. New York Times Co., 501 F.2d 51, 58 (2d Cir. 1974)
(noting that "this factor cannot be overlooked in determining the
reasonableness of the restraint presented"); Maltby v. Harlow Meyer
Savage Inc., 166 Misc. 2d 481, 486 (N.Y. Sup. Ct. 1995) (holding
six-month covenant not to compete reasonable so long as employee
continued to earn his salary), aff'd, 223 A.D.2d 516 (N.Y. App.
Div. 1st Dep't 1996).     The desire to avoid "impairing the
employee's ability to earn a living," see Am. Broad. Cos., 52
N.Y.2d at 404, is largely mitigated where an individual continues
to receive a salary in return for not competing.   See Ticor, 173
F.3d at 71-72 ("The significance of the salary paid in Maltby, [166
Misc. 2d at 486,] was that it helped alleviate the policy concern
that non-compete provisions prevent a person from earning a
livelihood.").

Under the terms of the Non-compete Agreement, Batra is to be subjected to a worldwide geographic limitation and a durational limitation of twelve months. The reasonableness of each component of the scope of the agreement shall be judged in accordance with Estee Lauder's need to protect trade secrets.

It is concluded that the geographical limitation of the covenant is reasonable under the circumstances. While under some circumstances, such a widespread restriction would be patently unreasonable, on the facts presented, it is not so here, given the scope of Batra's responsibilities for R+F and Darphin and the international scope of Estee Lauder's business and the cosmetic industry in general. Such broad geographic limitations have been deemed reasonable where warranted by the nature and scope of the employer's business. See, e.g., Business Intelligence Services, 580 F. Supp. at 1072-73 (finding worldwide scope reasonable "given the international nature of [the employer's] business").

Given that Estee Lauder contracted to pay Batra his salary for the duration of the twelve months, the fact that the geographic scope is all-encompassing will not render it overbroad and therefore void. In other words, although, under the contract, Batra essentially is prohibited from working for a competitor of R+F or Darphin anywhere in the world, the concern that the breadth of such a prohibition would make it impossible for him to earn a

51

living is assuaged by the fact that he will continue to earn his salary from Estee Lauder, as he contracted to do so.

With respect to the durational restriction imposed upon Batra by the Non-compete Agreement, it is concluded that twelve months is not warranted in order to adequately protect Estee Lauder's interests. To be sure, under some circumstances covenants not to compete of one year or longer may be deemed reasonable. See, e.g., BDO Seidman, 93 N.Y.2d at 382 (holding 18-month covenant reasonable). However, under the facts of this case, it is determined that the period of time set forth in the agreement and advanced here is greater than necessary to adequately protect Estee Lauder's trade secrets and to protect the interests of Batra.

While, as Estee Lauder points out, some of the trade secrets to which Batra was privy arguably have a durational life of as much as two to three years, the evidence presented with respect to Estee Lauder's general behavior surrounding the enforcement of restrictive covenants suggests that such a length of time is generally unnecessary, and it is deemed unnecessary here.

First, similar covenants not to compete have not been enforced against other members of Estee Lauder management for twelve full months. During his deposition, Bousquet-Chavanne testified that the first time he left Estee Lauder his non-compete agreement was cut-down from six months to three months. (Hearing

Trans. 03/23/06 at 43). Similarly, when another Estee Lauder executive, Claudia Poccia, the Manager of the Stila brand, recently left her position, her non-compete agreement was reduced from six months to between four and five months. (Id. at 44). There has been no demonstration here that Batra -- who held a position comparable to those held by Bousquet-Chavanne and Stila Manager when their non-compete agreements were reduced -- possesses trade secrets that warrant a longer protection than those possessed by Bousquet-Chavanne and the Stila Manager.

More importantly, in Batra's case, the evidence suggests that, upon announcement of his departure, Batra himself was offered a reduction of his non-compete to four months by Estee Lauder.[5]

Therefore, in accordance with the authority to grant partial enforcement, a five-month period of enforcement is deemed reasonable. A five-month period takes into account the four-month period proposed by Estee Lauder upon Batra's announcement of his departure, plus the transitional period they sought from Batra. Given Estee Lauder's general practice regarding Non-compete

---

[5] While it might be argued that these reductions were based upon an amicable agreement amongst the parties, something that was not reached here, it is determined that this distinction is not relevant. In New York, covenants not to compete shall only be enforced for the length of time for which the employer's confidential information will be competitively valuable. It is concluded that, even though Estee Lauder and Batra were unable to reach an agreement on a reduction of the length of his non-compete, Estee Lauder's offer of four months reflects a recognition on its part that four months would be sufficient to protect its interests.

agreements, as outlined above, it is determined that a five-month period will adequately protect the trade secrets Estee Lauder has identified regarding upcoming products while minimizing Batra's loss of liberty, in keeping with New York's policy regarding restrictive covenants.

For the reasons set forth above, it is concluded that Estee Lauder has established a likelihood of success on the merits of its claim.

## E. Sufficiently Serious Questions Going to the Merits and a Balance of Hardships Decidedly in Its Favor

In the alternative, the Court is satisfied that, at a minimum, Estee Lauder has demonstrated sufficiently serious questions going to the merits of their claims to make them a fair ground for litigation. Therefore, because Estee Lauder has demonstrated a balance of hardships tipping decidedly in its favor, a preliminary injunction is warranted in this case. Brewer v. W. Irondequoit Cent. Sch. Dist., 212 F.3d 738, 743-744 (2d Cir. 2000).

Here the risk of Batra's loss of livelihood is entirely mitigated by the fact that Estee Lauder will continue to pay Batra his salary of $375,000 per year for the duration of the "sitting out" period. While he will not be permitted to engage in any employment of his choosing, he will receive due consideration for

54

fulfillment of his agreement not to work for a competitor. Not only is Batra entitled to his full salary from Estee Lauder during the non-competition period, he is permitted to earn additional compensation from non-competitive work during the period. Additionally, the evidence demonstrates that restrictive covenants are common in the prestige cosmetics industry. As such, it is concluded that Batra's absence from the industry for a few months will not significantly impair his ability to earn a livelihood in the future and therefore will not cause Batra undue hardship.

In contrast, Estee Lauder has shown that in the absence of a preliminary injunction it is likely to suffer irreparable harm if Batra were to use and/or disclose its confidential information. Accordingly, the evidence demonstrates that the balance of hardships tips decidedly in Estee Lauder's favor.

## The Non-solicitation and Confidentiality Agreements

There has been no dispute over the enforceability of the non-solicitation and confidentiality clauses of the Agreement under New York or California law. Therefore, it is concluded that those portions of the Agreement are also enforceable, and for the same reasons set forth above, Batra shall be preliminarily enjoined from violating them.

**Conclusion**

The motion for the preliminary injunction is granted in accordance with this opinion and the motion to abstain is denied. Submit an order granting preliminary injunctive relief on notice.

It is so ordered.

New York, NY
May    ↲    , 2006

ROBERT W. SWEET
U.S.D.J.

56